United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **FRED ARKO,** | Case No.: 13-CV-1044 YGR |
| **Plaintiff,** | **ORDER GRANTING DEFENDANT HARTFORD** |
| | **INSURANCE COMPANY'S MOTION FOR** |
| **v.** | **JUDGMENT, DENYING PLAINTIFF ARKO'S** |
| | **CROSS-MOTION FOR JUDGMENT** |
| **HARTFORD LIFE AND ACCIDENT INSURANCE** | |
| **COMPANY,** | |
| **Defendant.** | |

Plaintiff Fred Arko brings this action against Defendant Hartford Life and Accident Insurance Company, seeking long term disability benefits under a Hartford Group Insurance Policy ("the Policy"). The parties' cross-motions for judgment came on for hearing on May 13, 2014.

Having carefully considered the papers submitted, the pleadings in this action, the arguments made by counsel at the hearing, and for the reasons set forth below, the Court hereby **GRANTS** Defendant's motion for judgment, and **DENIES** Plaintiff's cross-motion for judgment, for the reasons stated at the hearing, and as follows.

## I.   BACKGROUND

This is an Employee Retirement Income Security Act ("ERISA") case wherein Plaintiff challenges the denial of payment of long term disability insurance benefits. Plaintiff is 64 years old and has had Multiple Sclerosis ("MS") since 1985. Until January of 2000, Plaintiff was employed as President and CEO of Moor+South/Pier Management Co., L.P. ("Moor"). He claims that by January 2000, his MS had progressed to the point where he was unable to work in this capacity.

Events preceding Plaintiff's termination from his position as President and CEO suggest that the relationship between Plaintiff and Moor was increasingly strained. While Plaintiff was on

a medical leave of absence, an employment dispute arose between Plaintiff and Moor, and Moor terminated his employment on February 2, 2000.  Moor subsequently reinstated Plaintiff's position and the parties undertook negotiations to resolve the dispute, during which Moor paid Plaintiff salary continuation.  In December 2000, the parties went to mediation, which resulted in a settlement agreement providing Plaintiff with a considerable sum if he "voluntarily quit" his job.  This formally terminated Plaintiff's employment.

### A.  Long Term Disability Policy at Issue

Over ten years later, in September **2011**, Plaintiff filed a long term disability claim with Hartford, the insurance company that had issued a Policy to Moor, effective September 1, 1991, Policy No. GLT-133203.  (AR 364.)  Plaintiff informed Hartford that he became disabled and ceased working on **January 10, 2000** due to MS.  (AR 252-255 (Application for Long Term Disability Income Benefits).)

The relevant portions of the Policy are set forth herein.  First, the Policy defines "disability" or "disabled" as meaning:

> You are prevented by
>
> 1.    accidental bodily injury;
> 2.    sickness;
> 3.    Mental Illness;
> 4.    Substance Abuse; or
> 5.    Pregnancy,
>
> From performing one or more of the Essential Duties of Your Occupation and as a result your Current Monthly Earning are no more than 80% of your Indexed Pre-disability earnings.  (*See* AR 384.)

Next, the Policy also contains a contractual limitation term for when legal action can commence:

> Legal action cannot be taken against us:
> 1.  sooner than 60 days after due proof of loss has been furnished; or
> 2.  three years after the time written proof of loss is required to be furnished according to the terms of the Policy.

(AR 379.)  As for when written proof of loss is required to be furnished, the Policy states:

> Written proof of loss must be sent to us within 90 days after the start of the period for which we owe payment.  After that, we may require further written proof that you are still Disabled.
> If proof is not given by the time it is due, it will not affect the claim if:
>
> 1.  it was not possible to give proof within the required time; and
> 2.  proof is given as soon as possible; but
> 3.  no later than 1 year after it is due, unless you are not legally competent.

(AR 378.)

Pursuant to the terms of the Policy, Hartford has discretion to determine eligibility for benefits.  (*See* AR 379 ("We [(Hartford)] have full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Group Insurance Policy.").)[1]  Accordingly, Hartford undertook to determine whether Mr. Arko was eligible for long term disability benefits.

**B.  Chronology of Assertion of Claim**

The record in this case chronicles a history of Plaintiff's claim for disability coverage, Defendant's denial, the appeals, and the affirmations of the prior decision.  Plaintiff's initial contact with Hartford began in October 2011, when Mr. Arko sent a letter to Hartford wherein he stated that his MS symptoms had worsened in the 1990s to the point where he was unable to work in 2000.  (AR 43-44; 76-80.)  Hartford asked Mr. Arko to provide a statement explaining the delay in reporting the claim, in light of the approximately ten year gap between his claimed disability onset date and the date he filed his disability claim.  On at least two different occasions, Hartford requested information relating to: (1) all physicians who had treated Arko during his disability; (2) all medical records; (3) his social security disability insurance claim; and (4) any earnings received. (AR 74-82.)  In response, Mr. Arko explained that he had been unaware of, or had forgotten, that there had been coverage for long term disability under the Policy.  (AR 43; 267.)  Mr. Arko also provided a list of doctors who treated him during his time of total disability (AR 264-65), medical records from 1989 (prior to his alleged disability onset date) (AR 332-334; 345), medical records

---

[1] The discretionary term presents in the January 1, 2000 Policy.  (*See* AR 379.)  The policy terminated on October 1, 2003.  (*See* Dkt. No. 55-1, Dec. of D. Kryzanski.)

United States District Court
Northern District of California

1   from 2000 to 2001 (Arko's alleged onset period) (AR 268-271; 347), and intermittent records from

2   2005-2011 (AR 272-283; 300; 308-09; 314-17; 323-26; 336-40; 352).

3       Given the gaps in Mr. Arko's medical history documenting the alleged period of disability,

4   Hartford asked Arko for additional documentation on several occasions.  (AR 31 (December 2011

5   communication log: "[called Mr. Arko and] advised I reviewed all the info, and there are gaps in tx

6   around the time he became [disabled] from 1998-2001, and then from 2001-2005... [Mr. Arko] will

7   contact [UCSF] to discuss sending additional notes"; "advised [Mr. Arko] at this time the timeline

8   from 2000 to present regarding his disability is not clear.  It's not clear [what] happened that caused

9   [Mr. Arko] to become disabled and what changed in his condition  to cause him to stop working.");

10  70 (December 2011 Letter from Hartford to Mr. Arko stating that they "still need" copies of

11  medical records from "all treating providers for your entire period of Disability (2000 through the

12  present")); 72 (November 2011 Letter re same); 74 (November 2011 Letter re same); 76 (October

13  2011 Letter re same); 80 (October 2011 Letter re same).)

14      In a letter dated December 21, 2011, Hartford issued its first denial of Mr. Arko's long

15  term disability claim, explaining that because he had not provided sufficient "Proof of Loss" or the

16  information previously requested,  it was not able to consider his claim for disability as of January

17  10, 2000 to the present.  (AR 66-69.)  Hartford further informed Mr. Arko that his failure to

18  respond to requests for medical records "hindered our ability to determine" whether he qualified for

19  long term disability benefits under the Policy.  (AR 68.)  In addition, Hartford asked whether Mr.

20  Arko had worked since 2000, and asked him to clarify the discrepancies between his stated last day

21  of work, his W-2 earnings for that year, and Moor's statement that Mr. Arko's employment had

22  terminated in November 2001.  Hartford informed Mr. Arko that if he could furnish the requested

23  information, it would reconsider its denial of his claim, and that he could appeal the decision under

24  ERISA.

25      In response to the December 21 letter, Mr. Arko informed Hartford that his last day worked

26  was January 10, 2000, his employer paid him through November 29, 2001, and his employment

27  ended by mutual agreement.  He also provided some new medical records:  one, a letter from Dr.

28  William Andereck of March 31, 2000; and two, 2011 medical records from internist Dr. Wright.

United States District Court
Northern District of California

Hartford responded that it still needed records from Mr. Arko's primary providers at UCSF for the period before and after his disability date, as well as financial and employment information, in order to reopen and evaluate his claim.

In January 2012, Mr. Arko began the appellate process regarding Hartford's decision. In support of his appeal, he resubmitted records he had previously sent Hartford along with three new documents: (1) a February 8, 2000 radiology outpatient referral ; (2) a February 17, 2000 MRI of his brain; and (3) a procedure note from 2012. (AR 117-126.) Hartford then informed Mr. Arko, through his counsel, that due to his persistent lack of documentation, it was denying his belated claim. Hartford identified documentation that remained outstanding and that was material to Mr. Arko's claim for benefits. The list included complete medical records from UCSF, financial information, and clarification of the circumstance surrounding the termination of Mr. Arko's employment with Moor. Hartford again informed Mr. Arko that if he provided such information, it would reconsider his claim for long term disability benefits. (AR 58-60.)

In the summer of 2012, counsel for Mr. Arko disclosed to Hartford that UCSF had no further records for him because the records had either been lost or destroyed. (AR 194-95.) Counsel provided a 2000 psychiatric evaluation from Dr. Steven Prakken, which noted that Mr. Arko had major depressive disorder of sufficient severity that he felt he needed to go out on medical leave.[2] (AR 225.) Dr. Prakken noted that in 1997, Mr. Arko had taken steroids for his MS, which had led to significant mood changes for the three months following their use, and that steroids were known to have such effects. (*Id.*) Counsel also provided (i) prescription refills for Paxil, which Dr. Prakken had prescribed, but no further records from Dr. Prakken; (ii) a June 2012 letter from Dr. Andereck, which purported to sum up Mr. Arko's medical history from the 1990s forward (AR 96); and (iii) a letter from the Social Security Administration ("SSA"), which stated that it had determined that Mr. Arko had been disabled since June 2008 (AR 196). Counsel for Mr. Arko did not explain why Mr. Arko alleged disability as of January 2000, but his 2000 W-2 reflected earnings from Moor greater than his yearly salary. (AR 221.)

---

[2] Apparently, this report related to the leave Mr. Arko took around the time the report was issued.

United States District Court
Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

On July 28, 2012, Hartford responded to Plaintiff's counsel indicating that even including the new information, the record remained incomplete.  Hartford nonetheless stated that if further information relating to Mr. Arko's psychiatric condition was provided it would consider a mental health claim.  (AR 57.)  Counsel for Mr. Arko maintained that Mr. Arko's application for disability based not on a mental health condition, but rather, symptoms resulting from his treatment for MS.  (AR 194; *see also* AR 49.)

In late August 2012, Hartford informed counsel that it had completed its review and denied his claim for the following reasons:  (1) Mr. Arko had failed to provide timely notice of his claim; (2) material information was still missing; (3) the more than ten-year delay significantly hindered Hartford's ability to determine that Mr. Arko was disabled from January 10, 2000, through the Elimination Period[3] defined under the Policy, to the present time.  (AR 53-56.)

Mr. Arko submitted his appeal on December 11, 2012, claiming that he had been disabled since 2000 due to secondary progressive MS.  (AR 174-183) (Arko Decl., AR 182 (*but compare* AR 159 (January 1998 Dr. Goodin letter "he has had a relapsing and remitting course [of MS]"); AR 151 (February 2000 UCSF Radiology Request (noting that Arko had remitting and relapsing MS).)  In support of the appeal, counsel for Mr. Arko provided a November 2012 letter from Dr. Pelletier, who had evaluated Mr. Arko at UCSF from 2001 to 2008.  Although Dr. Pelletier noted that Mr. Arko suffers from permanent physical and cognitive impairment, Dr. Pelletier did not opine that Mr. Arko had been disabled as of January 2000.  (*See* AR 183.)

On January 7, 2013, Hartford again denied Mr. Arko's appeal on the basis of insufficient information to establish disability.  Hartford's decision essentially mirrored its decision of August 2012, but provided greater detail and acknowledged that although Mr. Arko's condition had

---

[3] "Elimination Period" is defined as follows:
> "[T]he period of time you must be Disabled before benefits become payable.  It is the last to be satisfied of the following:
> 1.  the first 3 consecutive month(s) of any one period of Disability; or
> 2.  with the exception of benefits required by state law, the expiration of any Employer sponsored short term disability benefits or salary continuation program."

(AR 54.)

United States District Court
Northern District of California

1    worsened over time, the record still lacked sufficient evidence for Hartford to determine that he had

2    been disabled continuously from January 10, 2000 to the present.

3         On March 7, 2013, Mr. Arko filed the instant complaint against Hartford, the Moor Long

4    Term Disability Plan, and Moor.  (Dkt. No. 1.)  Mr. Arko dismissed the latter two on November 5,

5    2013.  (Dkt. No. 32.)  He seeks $2,178,303.00, which represents the amount due in benefits

6    payments less what he has received as SSA disability benefits.  In addition, he seeks an award of

7    attorney's fees and costs, as well as declaratory relief to direct Hartford to remit monthly payments

8    to Mr. Arko for as long as he continues to meet the definition of disability under the terms of the

9    Policy.

10        Hartford contends that its denial of Mr. Arko's late application for benefits was reasonable

11   and should be upheld on the merits for two reasons.  First, the basis of Hartford's denial is that Mr.

12   Arko's delay prejudiced Hartford's ability to discern whether Mr. Arko was disabled as defined by

13   the Policy on or about the date of his alleged disability onset.  Second, Hartford asserted that Mr.

14   Arko had not provided evidence sufficient to establish that he qualified as disabled as of the date he

15   claimed disability onset.  Separately, Hartford asserts three affirmative defenses to this ERISA

16   action – first, contractual limitations period of three years; second, judicial estoppel due to Mr.

17   Arko's actions during an unrelated bankruptcy matter; and third: unclean hands.

18   **II.    DISCUSSION**

19        **A.    LEGAL STANDARD**

20        "ERISA was enacted to promote the interests of employees and their beneficiaries in

21   employee benefit plans, and to protect contractually defined benefits. " *Firestone Tire & Rubber*

22   *Co. v. Bruch*, 489 U.S. 101, 113 (1989) (internal citations omitted).  ERISA "permits a person

23   denied benefits under an employee benefit plan to challenge that denial in federal court."

24   *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 108 (2008).  "ERISA's civil-enforcement

25   provision . . . allows a claimant 'to recover benefits due to him under the terms of his plan [and] to

26   enforce his rights under the terms of the plan.' " *Muniz v. Amec Const. Mgmt., Inc.*, 623 F.3d 1290,

27   1294 (9th Cir. 2010) (*quoting* 29 U.S.C. § 1132(a)(1)(B)).

28

United States District Court
Northern District of California

1

2

3

4

5

Where, as here, the court is presented with motions for judgment under Federal Rule of Civil Procedure 52, "the court conducts what is essentially a bench trial on the record, evaluating the persuasiveness of conflicting testimony and deciding which is more likely true." *Caplan v. CNA Fin. Corp.*, 544 F.Supp.2d 984, 990 (N.D. Cal. 2008) (citing *Kearney v. Standard Ins. Co.*, 175 F.3d 1084, 1094–95 (9th Cir. 1999)).

6

7

8

9

10

The standard of review applicable to a plan administrator's denial of ERISA benefits is dependent upon the terms of the benefit plan. *Firestone*, 489 U.S. at 115. If "the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan," an abuse of discretion standard is applied; otherwise, the denial is reviewed *de novo*. *Id.*

11

12

13

14

15

16

17

18

19

20

21

22

23

"[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion." *Firestone*, 489 U.S. at 115 (internal quotation and citation omitted). An "inherent conflict" of interest exists where "a plan administrator both administers the plan and funds it." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 967 (9th Cir. 2006). Such a conflict, "should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration," and "should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits." *Metropolitan Life Ins. Co. v. Glenn*, 554 U.S. 105, 117 (2008). As the Ninth Circuit observed in *Abatie*:

24

25

26

27

28

> The level of skepticism with which a court views a conflicted administrator's decision may be low if a structural conflict of interest is unaccompanied, for example, by any evidence of malice, of self-dealing, or of a parsimonious claims-granting history. A court may weigh a conflict more heavily if, for example, the administrator provides inconsistent reasons for denial; fails adequately to investigate a claim or ask the plaintiff for necessary evidence; fails to credit a claimant's reliable evidence; or has repeatedly denied benefits to deserving

United States District Court
Northern District of California

participants by interpreting plan terms incorrectly or by making decisions against the weight of evidence in the record.

*Abatie*, 458 F.3d at 968–69 (internal citations omitted).

Here, Plaintiff argues that because Hartford is responsible both for administering the Policy and funding it, a structural conflict of interest exists that justifies heightened abuse of discretion review. Hartford argues that the abuse of discretion standard is appropriate.

Plaintiff goes on to argue, however, that California Insurance Code section 10110.6 ("Section 10110.6"), which became effective January 1, 2012, should void the discretionary term in the Policy and therefore the Court's review should be *de novo*. The Court finds this argument unpersuasive. As an initial matter, Plaintiff overlooks the fact that the policy was cancelled in 2003, and therefore did not "continue in force," much less "renew," after the enactment of Section 10110.6 in 2012. Cal. Ins. C. § 10110.6(b). Second, Plaintiff cites no case law to suggest that Section 10110.6 may apply retroactively, and indeed, there is authority directly to the contrary. *See Orzechowski v. Boeing Co. Non-Union Long-Term Disability Plan*, 2013 WL 979191 at *9 (C.D. Cal. Mar. 12, 2014) (Section 10110.6 applies prospectively and requires post-2012 policy renewal).

Here, Plaintiff has offered no evidence of malice or self-dealing and upon review of the record, the Court finds that the reasons provided by Hartford for the denial of Plaintiff's claim were consistent and supportable, and that Hartford repeatedly asked for necessary documentation to assist in its review. Accordingly, the Court evaluates Hartford's decision to deny Mr. Arko benefits pursuant to an abuse of discretion standard, taking into account the structural conflict noted.[4]

### B.    FINDINGS OF FACT AND CONCLUSIONS OF LAW

Mr. Arko bears the burden of establishing both that Hartford abused its discretion in denying benefits and that he was disabled under the terms of the Policy. Specifically, Mr. Arko must establish, based on evidence in the record, that as of January 1, 2000 to the date he filed his claim in 2011, (i) a sickness or injury prevented him from performing his occupation with Moor and (ii) he made less than 80% of his pre-claim earnings. (*See* AR 384.)

---

[4] The Court notes that even applying Mr. Arko's preferred *de novo* standard, given the record in this case and the Court's analysis set forth herein, it would nonetheless reach the same conclusion regarding Hartford's denial of Mr. Arko's claim for long term disability benefits.

United States District Court
Northern District of California

The Court acknowledges at the outset that the evidence of record establishes that Mr. Arko experienced significant deterioration in his MS starting around 2007, and his symptoms have progressed to the point of total debilitation in recent years.  (*See* AR 164.)  The parties do not dispute that Mr. Arko is currently disabled.  However, the Court's task at this juncture is not to determine whether Mr. Arko's symptoms *at present* amount to disability.  Rather, the Court must determine whether evidence supports a determination that Mr. Arko was disabled as of January 1, 2000, and whether Hartford's denial of his claim was improper.  Because the Court finds that the evidence of record does not support a finding that Mr. Arko was disabled as of the alleged onset date and that Hartford's denial of his claim was not improper, the Court need not, and does not, consider the myriad alternative arguments offered by Hartford in support of its motion for judgment.[5]

### 1.  Insufficient Record Evidence

#### a.  Lack of evidence to support Mr. Arko's claimed onset date

As for the first prong – Mr. Arko's functional capabilities and whether this meets the Policy's definition of disability – the administrative record lacks evidence to establish that Mr. Arko's MS rendered him functionally incapable of performing his job as of January 10, 2000. Particularly absent are contemporaneous medical evidence to support Mr. Arko's claimed disability onset date.  The record lacks any medical opinion substantiating that Mr. Arko was incapable of performing his occupation as of January 1, 2000 through the elimination period to follow.[6]  The only documentation contemporaneous with Mr. Arko's alleged disability onset date are records

---

[5] In conjunction with its Motion for Judgment and in support of certain arguments therein, Defendant Hartford filed a Request for Judicial Notice and exhibits.  (Dkt. Nos. 43, 52.)  Because the Court did not consider Defendant's arguments other than whether it abused its discretion in denying Mr. Arko's claim, which was limited to a review of the administrative record, the Court did not consider the materials for which Defendants requested judicial notice.  Accordingly, Defendant's Request for Judicial Notice is **DENIED** as moot.

[6] In his brief, Mr. Arko states that "every doctor who personally examined Fred concluded he was disabled." (Dkt. No. 49 at 14.)  This is a gross misrepresentation.  As explained in this Order, the majority of doctors who evaluated Mr. Arko did not expressly opine on whether he was disabled and in fact, many records from the time of his alleged disability onset and the years to follow contain notes that suggest he was *not* disabled under the Policy.

from three physicians:  (i) a February 2000 letter (AR 271) and MRI report and note (AR 117-119) from Dr. Goodkin; (ii) a January 2000 psychiatric evaluation from Dr. Prakken (AR 225-229); and (iii) a March 2000 letter from Dr. Andereck (AR 96).  None of these records considered separately, or in conjunction, establish that Mr. Arko met the definition for disability as defined in the Policy as of January 2000.

In the letter dated February 8, 2000, Dr. Goodkin at UCSF recommended that Mr. Arko take a leave of absence from work due to the onset of recent symptoms of his relapsing-remitting MS. (AR 271.)  The Goodkin letter is comprised of four sentences:

> Mr. Fritz Arko (DOB [. . .]/50) is under my care for the treatment of relapsing-remitting multiple sclerosis.  I have recommended that he take a leave of absence at work due to the onset of recent symptoms of MS.  He fatigues easily and has difficulty concentrating when he is fatigued.  It is my hope that you will grant him a leave of absence from work.

(AR 271.)  Although this letter does suggest that Mr. Arko was experiencing MS symptoms that interfered with his ability to do his job, it does not establish that Mr. Arko was prevented from performing essential aspects of his job due to MS.  Neither does Dr. Goodkin remotely opine that Mr. Arko would be unable to return to work in the future.  In addition, the letter was written almost a month after Mr. Arko claimed his disability onset date and is notably silent about that earlier period.  Finally, Dr. Goodkin does not opine that Mr. Arko's MS would prevent him from performing any aspect of his job in the future.  At best, the letter transmitted merely a "hope" that Moor would grant Mr. Arko a leave of absence as of February 2000.  The notion that the letter contained an opinion as to Mr. Arko's functional capacity at any point prior or as to the ultimate duration of his condition does not comport with the actual contents of the document.  Next, the MRI Radiology Request and Consultation Report (AR 117-119), which relayed MRI results and general symptoms, again did not offer any opinion or plausible inference that the MRI findings or symptoms prevented Mr. Arko from performing his occupation.  (*Accord* AR 345-46.)  The Outpatient Request form (AR 117) is similarly unpersuasive on this issue.  That form merely notes symptoms without describing how long these symptoms had existed or whether and to what degree

United States District Court
Northern District of California

and frequency they impacted Mr. Arko.  No further treatment notes were provided to Hartford to substantiate Dr. Goodkin's "hope" that Mr. Arko would be granted a medical leave.[7]

Mr. Arko next relies considerably on a psychiatric evaluation consultation of Dr. Prakken from January 25, 2000.  That report, again, is insufficient.  On the one hand, the report notes that Mr. Arko had been experiencing increasing symptoms of depression resulting in his decision to go out on medical leave, on the other, it also reveals that his depression symptoms were less severe than those he had experienced in 1997-1998.  (AR 225 ("Arko claims that his most significant mood changes began after taking steroids in the late spring of 1997.").)  Notably, there is no evidence in the record to suggest that in 1997, Mr. Arko was unable to work or took a leave of absence, which undermines Mr. Arko's claim that these "less severe" symptoms experienced in late January 2000 resulted in his continued disability.  Moreover, Dr. Prakken's report indicates that with the use of Paxil, Mr. Arko was showing signs of "mild remission . . . in terms of its intensity in comparison to a month and a half ago."  (AR 228.)  No further reports or notes of Dr. Prakken (for example, documenting follow-up visits or Mr. Arko's symptoms over time going forward) were provided to Hartford.

Finally, Mr. Arko proffers a letter from Dr. Andrereck dated March 31, 2000.  (AR 96.) That letter traces Mr. Arko's history of treatment with Dr. Andereck for his MS symptoms, but Dr. Andereck admits that he had not seen Mr. Arko personally since July 1999.  Instead, Dr. Andereck appears to rely on treatment notes from an associate in his office, Dr. Simmonds, regarding a

---

[7] Despite Dr. Goodkin's letter, the Court notes that in Mr. Arko's settlement agreement with Moor, signed in late March 2000, the parties documented their express disagreement as to whether Mr. Arko's leave from his position was due to medical needs.  (AR 138 ("WHEREAS, Arko commenced a leave of absence from his position as President and Chief Executive Officer of Pier 39 on January 13, 2000 (The parties disagree as to whether there had been agreement that the leave was to be identified as a medical leave.)").)  Thus, Mr. Arko's claims that his leave to absence from work was a "medical leave" and that the Agreement independently corroborates his alleged disability onset date are undermined by the plain language of the Agreement itself.  (Dkt. No. 49 at 5-6.)  Similarly, Mr. Arko offers no evidentiary support for his representation that "Moor+South concluded that due to his MS, [he] could no longer fulfill his duties as President & CEO," (Dkt. No. 49 at 14) and the Court has found none in the record.  In fact, on the Employer's Section of Mr. Arko's Application for Long Term Disability Income Benefits, Moor represented that Mr. Arko stopped working because he "voluntarily quit."  (AR 250.)

United States District Court
Northern District of California

1    January 2000 visit.  Even so, the symptoms as recorded in the letter do not substantiate Mr. Arko's

2    claim that his MS so seriously impacted his functional capacity that he was unable to perform one

3    or more essential elements of his job.  Tellingly, nowhere does Dr. Andereck opine that Mr. Arko's

4    MS symptoms rendered him unable to perform his job permanently or for any significant period.

5    The most that Dr. Andereck's letter can be fairly said to support is that Mr. Arko's depression in

6    2000 was severe enough to "interfere" with his ability to work, and that it would "serve as a basis

7    for temporary disability."  (*Id.*)  That, without more, does not meet the Policy's definition of

8    disability – that Mr. Arko be "prevented by [MS] from performing one or more of the Essential

9    Duties of his occupation and as a result your current monthly earnings are no more than 80% of

10   your indexed pre-disability earnings."  (AR 384.)  Notably, Mr. Arko did not provide any further

11   records from either Dr. Andereck or Dr. Simmonds, including the former's treatment of Mr. Arko

12   from 1993 through 1999, or the latter's January 2000 appointment.

13        Having considered the contemporaneous medical evidence of record, the Court finds that it

14   was not an abuse of discretion for Hartford to determine that the proffered evidence could not

15   support Mr. Arko's claimed disability onset date or disability beyond the Policy's three-month

16   elimination period.

17                          **b.  Lack of evidence to support disability after alleged onset date**

18        Further medical record evidence spanning Mr. Arko's period of claimed disability (from

19   January 10, 2000 through the date of his filing in September 2011) similarly do not support Mr.

20   Arko's claim that his MS rendered him unable to functionally perform his occupation starting on or

21   about January 10, 2000 or in the years immediately to follow.

22        Although Mr. Arko claims essentially that his condition had declined to the point where he

23   was unable to work as of January 2000, the record contains *no medical appointment records of any*

24   *kind* between February 8, 2000 (the treatment note discussed above) and April 24, 2001.  The lack

25   of any records to suggest that Mr. Arko sought medical treatment for his allegedly debilitating

26   symptoms strongly cuts against his claim of disability on or about January 2000.

27        An April 24, 2001 MRI of Mr. Arko's head and neck confirmed the existence of his MS,

28   but offered no insights as to how the MS impacted Mr. Arko's functionality.  (AR 268.)  In a

history and progress note from December of 2001, almost two years after Mr. Arko's claimed disability onset date, Dr. Pelletier of UCSF indicated that Mr. Arko's remitting-relapsing MS was "stable," there had been "no progression," and Mr. Arko had had "no attacks." (AR 347.) Dr. Pelletier recommended an annual check-up. (*Id.*) These records do not establish that in the years that followed Mr. Arko's claimed disability onset date, his MS resulted in any inability to perform the tasks required for his job.

The record contains no treatment notes for the period following Mr. Arko's December 2001 appointment with Dr. Pelletier until March 2005. Thus, Hartford was substantially prevented from ascertaining, based on the record, whether Mr. Arko was continuously disabled during that time. Even disregarding this fact, however, the medical records provided from 2005-2008 undermined Mr. Arko's claim that he met the definition of disability.

March 2005 medical records from Dr. Pelletier at UCSF indicate that Mr. Arko's health was "stable" and that he had "benign MS [for] 20 years." (AR 336.) Although Mr. Arko tired after walking approximately one mile, Dr. Pelletier's notes indicate that he "work[ed] out every other day 20-30 minutes." (*Id.*) In June of 2006, another of Dr. Pelletier's notes indicates that Mr. Arko had experienced "no new attacks" and had "benign MS." (AR 337.) That same note indicates that Mr. Arko report that "work is fine . . . own business." These medical notes undermine Mr. Arko's claim that his MS rendered him disabled under the terms of the Policy from 2000 through 2011. Additional UCSF notes from September 2006 document that Mr. Arko had been experiencing significant stress for the last five years and that the stress had worsened in the last six months to a year, but again, these do not suggest that Mr. Arko's symptoms prevented him from working. (AR 339-40.) In fact, these same notes indicate that after Mr. Arko's antidepressant medication dosage increased, he experienced "imp[roved] mood." (*Compare* AR 339 *with* 340.)

By January 2007, the medical records do indicate that Mr. Arko's MS had worsened. However, none of them suggest that the condition discussed therein existed in 2000. Rather, the notes from UCSF indicate that Mr. Arko experienced symptoms "consistent with [an MS] flare," including leg weakness while walking (AR 342) and that he went in for a follow-up appointment at the end of February 2007 (AR 348). A flare suggests a single isolated event. These notes do not

United States District Court
Northern District of California

1    establish that Mr. Arko was prevented from working due to disability at that point in time or,

2    critically, since his alleged onset date.

3         Next, the medical records supplied by Dr. Pillai, Mr. Arko's physician in Memphis from

4    October 2008 through August 2011 demonstrate the progression of Mr. Arko's MS, which

5    worsened in late 2009.  However, they do not contain any findings concerning Mr. Arko functional

6    capacity to perform tasks such as those required for his occupation on or about his claimed

7    disability onset date.

8         In mid-2011, Mr. Arko moved to Montana and received treatment from internist Dr. Wright

9    and was evaluated by neurologist Dr. Schaeffer.  (AR 89.)  Dr. Wright noted that Mr. Arko was

10   confined to a wheelchair and Dr. Schaeffer opined that Mr. Arko was not capable of working due to

11   the permanence of his symptoms and the expectation that over time they would worsen.  (AR 89,

12   309.)  Neither Dr. Wright nor Dr. Schaeffer provided any evidence or opinion to support Mr.

13   Arko's claim that he had been disabled since 2000.

14        Finally, Mr. Arko relies considerably on two letters from physicians:  one from Dr.

15   Andereck, dated June 21, 2012, and the other from Dr. Pelletier dated November 29, 2012.  Both

16   were authored *after* Mr. Arko filed his long-term disability claim, and both are suspect.  First, with

17   respect to Dr. Anderek's letter (AR 163-64), it bears noting that he admitted in a previous letter that

18   as of March 2000, he had not seen Mr. Arko since July of 1999.  (*See* AR 96.)  The 2012 letter does

19   not reference any medical records or progress notes from Dr. Andereck's treatment of Arko over

20   time and thus, the foundation for his opinion is wholly lacking.  This is not surprising given the

21   admitted  *ten year* gap in Dr. Andereck's treatment of Mr. Arko – from 2002 to 2012.  Finally,

22   although Dr. Andereck opines that "in the late 1990s [Mr. Arko] was suffering significant cognitive

23   impairment from his disease such that it would be difficult for him to perform at a high executive

24   level," this statement is without reference to corroborating records (no such records were provided

25   to Hartford, either), and is undermined by the fact that Mr. Arko *was able to continue working in*

26   *his occupation* during the time in which Dr. Andereck opines he would have had such difficulty.

27        Next, with respect to Dr. Pelletier's letter, again, no substance exists.  (AR 183.)  This four-

28   sentence letter does not support anything other than the fact that Dr. Pelletier evaluated Mr. Arko

1    annually from 2001-2008 and that as of late 2012, Mr. Arko suffered from permanent cognitive and

2    physical impairment.  (*Id.*)  Dr. Pelletier does not purport to describe the nature of Mr. Arko's MS

3    symptoms from 2001-2008, nor does he offer any opinion as to Mr. Arko's functional capacity at

4    any time other than as of the date of the letter.

5           Accordingly, neither letter is probative on the question of whether Mr. Arko became

6    disabled over a decade before on the claimed disability onset date, or whether he remained disabled

7    in the time leading up to November 2012.

8                                               ***

9           Viewed as a whole, the record shows that Mr. Arko experienced symptoms of MS prior to

10   and after his alleged disability onset date, but with particularly increasing severity starting in 2007.

11   As the Court noted at the outset of its findings, no dispute appears to exist that Mr. Arko is

12   currently disabled due to MS.  The evidence of record, however, does not support a finding that the

13   MS symptoms Mr. Arko experienced in January 2000 or the years immediately following

14   consistently prevented him from performing an essential aspect of his occupation.  The lack of

15   evidence in the record on this point compromises fatally Mr. Arko's claim for long term disability

16   benefits.  What evidence does appear in the record is simply not sufficient to enable this Court, or

17   Hartford, to conclude that Mr. Arko met the Policy's definition of disability from January 10, 2000

18   forward.[8]

19   _____

20   [8] Relatedly, because Mr. Arko's claim was filed over a decade after he claims he became disabled,
     during which time his condition progressed and worsened, Hartford has established actual prejudice

21   to its evaluation of Mr. Arko's claim for benefits.  *See UNUM Life Ins. Co. of Am. v. Ward*, 526
     U.S. 358, 367 (1999) ("The insurer must show actual prejudice, not the mere possibility of

22   prejudice.") (citations omitted).  Indeed, it is hard to imagine a case where actual prejudice could be
     more apparent.  The paucity of medical record evidence on or about the alleged disability onset date

23   and the years to follow, in conjunction with the progressive nature of Mr. Arko's MS, make the
     need for contemporaneous evaluation and investigation in this case particularly acute.  But due to

24   Mr. Arko's late filing, Hartford was never able to undertake a contemporaneous investigation.
     Moreover, in the intervening decade, UCSF lost or destroyed Mr. Arko's medical records; a more

25   timely filing of his claim could have enabled Mr. Arko and Hartford to access those critical records.
     (AR 194.)  Mr. Arko's contention that Hartford should have communicated with his physicians

26   before denying his claim in 2012 is unpersuasive.  Those same doctors already supplied letters in
     connection with Mr. Arko's claim, which as explained above, do not support his claimed disability

27   onset date of January 10, 2000.  Mr. Arko's next claim that Hartford should have conducted an
     independent medical examination is likewise unpersuasive, for an assessment of his current

28

Mr. Arko did not lack for notice that his claim was to be denied for this reason.  Hartford repeatedly informed him that the medical records provided were insufficient to permit it to determine that he was disabled for the claimed period, and provided several opportunities for Mr. Arko to supplement the record.  Following each supplemental submission of medical records, Hartford reevaluated Mr. Arko's claim and reasonably determined that the record did not support his eligibility for long term disability benefits.

Accordingly, having considered all of the evidence of record and accorded particular attention to the medical records provided by Mr. Arko in support of his claim, the Court finds that such evidence is not sufficient to support Mr. Arko's claim that he was disabled from on or about January 10, 2000, to September 2011.  Hartford's denial of his long term disability claim on this basis was not an abuse of discretion.

### CONCLUSION

For the reasons stated above, Defendant Hartford's Motion for Judgment is **GRANTED**. Plaintiff's Cross-Motion for Judgment is **DENIED**.  Within five days of the entry of this Order, the parties will file a proposed form of judgment for this Court's approval.

This terminates Docket Nos. 43, 49, 51.

**IT IS SO ORDERED**.

Date: October 10, 2014

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

---

physical and mental state cannot overcome the absence of medical records or resolve the question of whether he was disabled under the terms of the Policy in January of 2000 through the Elimination Period.  In sum, the Court finds that Mr. Arko's decade-long delay in filing his claim resulted in actual, substantial prejudice to Hartford.